The next matter for oral argument is the United States v. Michael Hester. Leticia Olivera Good morning, Your Honors, and may it please the Court, my name is Leticia Olivera and I represent Michael Hester. With the Court's permission, I'd like to reserve three minutes for rebuttal. Thank you. Our appeal addresses two errors. First, the District Court's denial of Mr. Hester's motion to suppress and the Court's application of a four-level enhancement for possession of a firearm in connection with another felony offense. Let me start with the firearms enhancement. What's the prejudice here? Excuse me? Where's the prejudice? The judge increased by four and then decreased by four and sentenced your client to relatively the bottom end of the guideline, so where's the prejudice? The prejudice here is in that the incorrect application of the guideline enhancement affected his sentence. How? How? Because he then reduced it by the same number, he increased it and went to the bottom end of the guideline. He said that's what he was doing. He explained why he was giving the decrease. Then he gave the application of a possession, which he said was crazy, and then he went on to mitigate that. The judge very clearly expressed on the record his reasons for granting a variance in this case. And given the record that both of my colleagues have just referred to, isn't it a fair conclusion by us that what the District Court had here in mind was a specific sentence? He accounted for the craziness of this enhancement, reduced the sentence concomitant to that enhancement and got to the sentence that he thought was appropriate. Don't you think that's what happened here? And don't you think the record supports that as what happened here? I think the record shows that Judge McNulty saw a need for a four-level variance in this case based on the harshness of the enhancement. The variance from what? A variance from an offense level that included this enhancement. Right. So the law on this is clear. An error in the calculation of the guideline range will only in rare cases be shown to be harmless. This is not one of those rare cases because on this record we cannot be sure of what Judge McNulty would have done without the application of the enhancement. Didn't he say that? Didn't he specifically say why he was varying downward from the sentence that were otherwise? He said he was varying downward, but what he didn't say is that he's not taking this enhancement into account, which is what you need in order for this to be harmless. We don't know on this record what Judge McNulty would have done if he hadn't had to grant a four-level variance in this case. And you said we can't be sure. What is the test that we are required to apply in making some determination as to whether this was harmless error here? I think we have to be certain that the error didn't affect the ultimate sentence. And in this case, as I mentioned, the judge grants a four-level variance. The starting point in this case is not after he grants the four-level variance. It's an offense level that includes that four-level enhancement. Well, the judge clearly understood his authority to vary. He could have varied further had he so deemed appropriate, right? Yes. And he didn't? He didn't. But the issue is here, the issue here is that after he grants the four-level variance, he looks at a range and he starts from the top of that range and he subtracts the amount of credit that he wants to give Mr. Hester for his time in state custody. On this record, we don't know. Would he have started at the top of the range? Would he have started somewhere else in the range? Would he have granted a different type of variance on different grounds if the starting point hadn't been 120 months? And that's just not clear from the record. And I think that it would be a mistake to take all of the reasons for granting a variance and then consider them as his reasons for not taking this enhancement into account. So we're assuming the enhancement was inappropriately given. Was he wrong to include the four points? He was wrong to include the four points for a couple of reasons. The government in this case justified its decision to seek this enhancement on this court's line of cases starting with Of course, this court recognized in Keller that it's an open question as to whether or not those cases remain viable outside of the context of burglary or drug trafficking. What we have here is a case where the alleged other felony is evidence tampering. This case does not satisfy the Navarro test because the other felony in this case is based on As the district court correctly concluded, this isn't what we usually think of when we think of a firearm being possessed in connection with another felony. Because here, the firearm is the other felony. And there's nothing beyond Mr. Hester's possession of the firearm that really plays a role in the other felony offense or even facilitates it. So whether or not this court decides that the Fenton-Navarro line of cases still has any application outside of the context of burglary or drug trafficking, I think the facilitation enhancement in this case is not satisfied because when we think of facilitation in these cases, we think of the firearm being used as an instrument of violence. The purpose of this enhancement is to address situations where the presence of the firearm creates an increased risk of violence associated with another felony. That's simply not what we have here. And I think that the unfairness that the district court recognized in applying the enhancement in this case is based on the fact that the government is unfairly taking advantage of the fact that the tampered evidence in this case is the firearm. Because let's say that the tampered evidence had been a knife or something else. If Mr. Hester would have been found in possession of the firearm and the other object of tampered evidence, there's no way of showing that the possession of the firearm in any way facilitated that other felony offense. I wouldn't want to take up all your time on the enhancement. What's your position with respect to the suppression motion? Did the judge not, where did the judge go wrong, so to speak? There are a few places indicated in our brief where we think the judge went wrong. There are a few places in fact where you're suggesting that there were clearly erroneous determinations made. That's correct. The district court in this case clearly erred when they found that the officers did not turn on their overhead lights. What does the record show with respect to that? So in this case, neither officer testified that they didn't turn on their overhead lights. So by not testifying that they didn't, is that, did you just use a double negative? I'm trying to understand. Sorry, just to be more clear. Neither officer testified what the court ultimately found. We did not turn on our overhead lights. Neither officer said that. What we have in the record, though, is a police report that one officer testified was true and correct. And that police report says that the officers that pulled up behind turned on their overhead lights. Was there also testimony, though, that it's unusual practice to have done that? Yes. So the officer that... Is that the incident report you're talking about? That's the incident report. Does that appear anywhere in the record? Because I didn't... It was entered into evidence at the suppression hearing. I've counted the record before us. It's not. All right. The officer that pulled up behind Mr. Hester, when asked whether or not he turned on the overhead lights, he said, I don't remember, but during a traffic stop. You're talking about Constantino, I believe. Constantino, yes. He said it's their usual practice. Yes, he said... The closest we came to having any acknowledgment that the lights were on is when he said it's their usual practice, correct? Right. I think he said he uses the word customarily. That's right. That's correct. Let me ask this, and this might be a little bit of a train of thought. Hopefully, if it does, we can get back to it. But one, to look at myself, I'm not a friend of my colleagues, we haven't discussed this case. The problem I have is that there's no finding as to when the actual seizure occurred, unless I missed it. You can argue the seizure occurred when Hester is in a car that is blocked in, and the primary argument is it's not really blocked in because there's no patrol car in front. But if we don't leave all sense of reality here, I think it's fair to say that if you're sitting as a passenger in a car, and a police car pulls up on the side of you and in the back of you, you're not going to really feel like, I think I'm going to go to Dunkin' Donuts and check out their latte today. You're not going to feel free to leave. That's exactly our position. At the court... In this case, we don't feel free to leave. There's also then got to be some submission to the show of authority. That's the show of authority. There's got to be some submission to the show of authority. Take it to the point where a client attempts to get out of the car, and then my concern is there's no really fact-finding as to the chronology as to when the thought that one officer somehow knew it was a gun. You would agree that under MIMS, once there is a... Maybe you wouldn't agree. Once the officers take control of that car, could the officers argue or order all the occupants in the car out of the car? Because if they could, then how do you get into a plain view situation? Do you understand what I mean by that? I understand what you mean, and I think that that presumes that there's reasonable suspicion here, which of course our position is that the parking violation is not like a traffic violation where the officers probably would have the authority to order everybody out of the car. So I think that... You're saying the parking violation is different than the traffic, a moving traffic violation... That's correct. ...which would almost automatically give rise to terrorism because the officer has a right to stop and that MIMS kicks in and you've got plain view. That's correct. Did the Christian Court consider this the equivalent of a pedestrian stop? It did. I think the court quite clearly in its legal conclusions says that the officers in this case approached Mr. Hester like they would approach any pedestrian on the street. Where's the seizure? Where's the submission? Either the submission to the force or the refusal to submit to the force and the police follow up. Mr. Hester submitted in this case by staying put. He submitted in the exact same way. That's low, but that's my point. It's not clear to me. Did he submit by staying put so you've got a low situation and that constitutes the seizure or did he stay put for a few seconds, decide to get out of the car and the courts thought that he was feigning submission so they could execute his escape somewhere near the federal court. I don't know if that's when he's out of the car or if he's about to get out of the car, but he's actually conveying to the police that he's about to get out of the car. Because if he's getting out of the car in consequence of the car being stopped, then that may be Johnson. This is the kind of case where we really need exquisite findings of fact that we don't really have from the district court as to the exact sequence of events so we can determine when the seizure occurred. Well, to take that sequence of events based on the facts that the court did find, I think the show of authority that occurred here was immediate. That's the stop. That's the stop. That's the police rolling up. Right. Mr. Hester submitted to that show of authority by staying put. He's stationary when the cars pull up and he stays stationary. Well, he has to be unless he's going to be getting out before they pull up, which I guess he could be. But under this scenario, the fact that he's stationary when they pull up doesn't help us much. We don't know when he may have seen the cars. Well, I think it's fair to assume that he sees the cops as soon as they pull up behind him and next to the car. And he stays stationary as the officers park. For how long does he stay there before he decides to get out of the car? So we know based on the officer's testimony that he stays stationary as they park, they get out of the car, they position themselves outside of the exit, they ask the driver for her license. She explains she doesn't have one. Okay. There are four different officers. So be specific. One officer on the side of the driver's side. A few officers on the client's side. There's three officers on Mr. Hester's side. And at the time he's still sitting in his seat. And he's still sitting in his seat. Has anyone said anything to him at the time they come to the side of the car? They have not said anything to him. And the driver's not there yet. The driver's already sitting in the car. The driver's back, okay. Yes. The officers don't make any statements to Mr. Hester, but I think the fact that they don't make any commands, I mean, that's something that the district court uses to find that he was never seized. But I think the officers in this case didn't make any commands to Mr. Hester because they didn't have to. How are we not bound by Hoderi in this case? Because whether somebody submits to a show of authority depends on what they're doing at the time of the show of authority. Hoderi is a case that involves flight. This is a case that involves a stationary suspect. We do have flight. I mean, he does leave, correct? He does leave, but we have flight after the show of authority and the moment of seizure. This is not a seizure. I'll get back to the moment of seizure. That's my problem. Put the matter in the hat. If he made stationary, the officers come to the side of the car, and then he decides to get out, is that a finding of fact that the remaining stationary was fainting to set up an opportunity to leave? How does that get the remaining stationary under Lowe? Why isn't that inconsistent with Lowe and it's more Hoderi? Well, I think this is something that the court addresses in Lowe. In Lowe, I think the government presents an argument that Mr. Lowe looked like he was getting ready to leave. And I think the court quite clearly says that we can't consider whether we think that someone might have been getting ready to leave. There's a finding there by the district court that three steps backward that Lowe took did not constitute flight unattemptively, which made it a lot easier than this situation where we kind of have to read the tea leaves. Right. Well, I think what we have to do in this case, you have to separate the moment of seizure from the flight. By the time the flight happens, and I think this is what makes this case. Well, that assumes that the flight did not have anything to do with the seizure. And I'm sure your colleagues would argue that the seizure may well have occurred after the flight, but we wouldn't argue that. After the flight, if there had been no seizure yet, there would not have been guns in plain view. Right, that's correct. And I think the moment of seizure is, of course, critical in this case. It's in every case. But I think what makes this case different from Hoderi is, and I think the reason why Mr. Hester was illegally seized is because when the officers approach the car and make the show of authority, he submits by staying put, and only after that does he flee. And the Fourth Amendment inquiry looks at these encounters in stages. The fact that he flees after the moment of seizure doesn't undercut his seizure. This court's never found that there's some kind of durational requirement or temporal requirement when it comes to a seizure. There's a moment of seizure, and at that moment— Let me say the seizure. And I was talking about this when I was reading the facts of this case. What if someone initially decides to submit because they're really intimidated, and then they think, heck, this, I'm out of here, man. I don't have to sit still for this. The cops are always controlling this neighborhood. I'm not going to stand for this. I'm out of here. So the person initially submits, and then they change their mind, and they flee, and the police obtain control of them after the flight. Other cases, some of them suggest that the seizure occurs when the person, when the police obtain control of them, which would defer this for a minute. How does that play into this and why don't we have that here? So the momentary submission, he changes his mind, he flees. Doesn't the flight then cancel the submission and take away the moment, or change the moment of seizure? I don't think so. And in the same way that Mr. Lowe's failure to raise his hands or comply with a police command, that didn't undermine the fact that he had submitted. I think the rules on this are fairly clear. Once you are seized, if an officer does not have a reasonable justification for that seizure, we don't look at whatever happens after. We look at what is going on as of the moment of seizure and decide right then and there, you know, was the seizure justified and, you know, should the exclusionary rule apply. I don't, this court has never looked at, you know, what's going on in someone's head when they submitted. What should the police have done here? If there's a situation where the police were concerned for their own safety, they approach a car, traffic stops, and this is putting this under the general rubric of traffic stop, even though it's a parked car, incredibly dangerous situations. Officers don't know who's in that car or what they're dealing with. What should they have done? Well, Your Honor, I disagree that this is an incredibly dangerous situation. It's a high crime area, but it's also a largely residential area. It may not be a dangerous situation. The point is they don't know. They may not find out until it's too late. They don't know, and they also have no reason to assume that it's a dangerous situation. I mean, what we have, the only thing that they've observed here. But don't they have to take minimum precautions? Should they leave the guns in the car and say we want to escalate the situation? Let's leave our guns here and just, you know, walk up and talk to these folks and see what they're doing sitting outside the store? Right. I think what the officers should have done here is maybe pull up alongside the car, lower the window, and say, excuse me, ma'am, I realize that the curb is not marked and there's no no parking sign, but you need to move it along because you're illegally parked. If they wanted to give her a parking ticket. And in some neighborhoods that would have happened. Of course, of course. If they wanted to give her the parking violation. She wasn't even in the car when they rolled up. She was coming out of the store, which they believed to be a drug place. Right. She's in the car by the time that they pull up. She's sitting in the car. My recollection was the same as David's. I thought she wasn't in the car at the time. She comes up, she says she doesn't have a license to drive, and they give her the keys and let her drive away. And you're fine. It's amazing. Right. You know, what should have happened here is, as I mentioned, they could have asked her to move it along. The curb's not marked. She's not presenting a danger to anybody. If they wanted to give her the ticket, maybe one officer could have gotten off the car, knocked on the window, said, good evening, ma'am, you're illegally parked. I'm going to give you a parking ticket. Did they have enough for a tariff stop at that point? So I think the question that's before this case is not whether there's enough for a tariff stop. That's the question that Judge Restrepo just asked you, though. And I'd rather you answer his question than your question, too. This is a good question, and I'd like to hear him. So if I answer his question and you answer your question, that would be helpful to me. Neither the Supreme Court nor the circuit have ever held that a traffic stop justifies a tariff stop. Back up a second. If you have a traffic stop in the judicial sentence, you don't need a tariff stop. You've got grounds to stop the car. And that sets in the whole chain of events. As I said earlier, the Mips kicks in and Plainview comes into play. So the tariff stop is when you don't otherwise have reason to stop and there's a reasonable suspicion that would justify the police encountering and having some kind of interaction and investigation. Right. So in this case, I'm sorry, I went right to the traffic stop, because based on these facts, there's no suspicion of criminal activity. What we have is a woman in a residential neighborhood that appears to go into a store that's open, that both officers testify, sell legitimate items, and she comes out. The most natural understanding of her conduct is that she's just bought something. If the officers had some suspicion based on the fact that they know this store to be the site of a previous narcotics arrest, that suspicion is not reasonable, because it cannot be the case that every single person that visits this store gives rise to criminal activity. There's a line of cases then that say that in this contract, Fourth Amendment contracts, the intent of the officers doesn't matter. If the police have guns to do, again, a traffic stop where the cars are moving, but the real reason they stop is not because they tell it, but because they see four black guys sitting in there and they're suspicious and they want to have a look. That doesn't matter, it's still a legitimate stop. That is something that is the officer's subjective intent with respect to the reasonableness of the stop text. That, of course, is not something we deal with right now. And there is no factual dispute here. There has not been any factual dispute, as I understand the condition of the record, that there were facts relative to the placement of this vehicle, the street, the curb, and the parking zone, that the car was parked at a spot and at a distance that made it in violation of parking regulations. Isn't that correct? That's correct. There's no dispute about that. There's no dispute about that. Getting back to the question of intent, we think that whether an officer intends to see someone is different than the subjective justifications for the seizure. All right. We will have you back then. How much time do you reserve for me? I reserve three minutes. All right. Thank you, Ms. Olita. Thank you. Mr. Romano. May it please the Court, John Romano for the United States. Let me start first just with that quick factual issue. Page A253 talks about the overhead light situation, and the testimony is from the second officer who's in the unmarked car. He says, we did not have overhead lights. We might have put on our rear lights, but I don't remember if we did or not. There's also testimony on that page that it's customary to use their overheads, right? Customary to use our rear lights. He doesn't have overhead lights. So I just want to point that out, that when Judge McNulty said no overhead lights, there is no testimony that overhead lights were ever used. So I think that's a fair finding. So when the three police officers approach Mr. Hester, is he underseized? Is he seized when they approach him on the side of the car? I think we agree with Judge McNulty that at that point he was not seized. I think if you look at this, and we lay in our brief, for the defendant to win here, he needs to run the table on all three of these issues. And we'll start with the first one. Was there a show of authority? The officers park next to and behind the car. They get out. Isn't that a show of authority? By itself, Your Honor, I don't think it is. Let's look at the Mendenhall factors, you know, overwhelming police presence, guns drawn, you know, lights, commands. Just put yourself in the shoes of an ordinary citizen. I know what you're looking at because you've got the Assistant Attorney badge that's going to be conveniently on display when you're pulled over. But let's assume you didn't have that badge and you're parked somewhere. You were an Assistant United States Attorney. I didn't have a badge. To this day, I resent that. It's something I grew up with. Mushrooms wouldn't buy us badges. I don't have a badge either, Your Honor. I think you need to look at the factors. And let's look at Drayton. This, I mean, they go on a bus, three officers. There's a small alleyway where you could walk, you know, where you walk on the bus. They're walking and they see a person. They say, that's not a show of authority. So I think if we look at the factors here, officers get out. One officer walks up to the driver, who's in the car, by the way, already. So they see her run out of the store and get into the car. They pull up. Do you have a license? No. Immediately, Mr. Hester says, I can drive, opens the door, drops the gun, runs. So I would say, I think Judge McNulty was correct. Are you saying that in that sequence, he was getting out of the car to switch around so that he could drive? Is that what you're saying? Well, he said something like, I can drive. He opens the door. They get out of the car. Okay. He drops the gun. They hear it. They yell down. He runs. So the show of authority, look, I don't even think this court needs to get to any of these issues because it could jump right to the last one. They had probable cause, reasonable suspicion to stop the car, stop its passenger. What is the difference between reasonable suspicion and probable cause? Are you saying they had a probable cause, or are you saying they had reasonable suspicion to justify a taxi? What are you saying alternatively, depending upon how the stop is characterized? However you want to characterize it, they see a parking violation, which is undisputed. And what does that give them the authority to do? They have the authority to walk up to that car, stop everyone who's inside, give a ticket. So everyone who's – this is like a traffic stop situation. The ticket's interesting because there is no ticket here. There is a ticket. They give two tickets. But she can't drive. They give two tickets to the driver for – They couldn't produce the tickets at the hearing. They're not in the record, are they? But there's testimony that they gave tickets, which in fact – The tickets themselves are not in the record. What is in the record is testimony. Yes, and I think Judge McNulty credited that testimony. A ticket that she had no license and a ticket that she was too close to the crosswalk. At that point, this is just like a traffic stop in Judge McKee. I think you're right. They exercise caution. They have to make sure that the passengers aren't doing crazy things in the car. They have to make sure that their safety is ensured. They simply walk up. At that point, they could seize everyone in the car, and that's basically the end. You don't need to go any further than that. Once he's lawfully seized, he drops the gun and he runs. That's in plain view. That's the end of the story. What does a seizure do? Define what is that seizure. The moment of the seizure. The moment they walk up and they stop the car. At that point, they could seize everyone in the car. He is seized then. Your Honor, if you look at it that way – That's what I'm asking you for this hearing. Our point, Your Honor, our point is there's three paths for the government. No, no, that's what I'm asking you. When is he seized? If you look at this as a traffic stop, the officers have the right to seize everybody at the moment they walk up to the car. If you look at this as a consensual encounter, which I also think you can do, but he's never seized, I don't think. He doesn't submit. So where is he now? So where is he now? He's been in prison for 10 years and he's not seized? I thought at some point he was essentially tackled. Well, he's seized at the point where he's not. It's kind of like a seizure unless it's a tackle by the Cleveland Browns. He wouldn't have it. He'd be having breakfast right now. Of course, after he drops the gun and runs off his tackle, he's seized. But the point is there's a couple of ways to look at this. Judge McMulty looked at it in the alternative, looked at it both different ways. One way is it's a consensual encounter. They merely walk up to the driver, ask to see her identification. That's not a seizure. That's Florida v. Bostick. You could ask for identification. They ask for identification. He drops the gun and runs. The next way you could look at it is there was a show of authority, but he didn't submit. As soon as they walked up, she says, I don't have a license. He says, we're good. I could drive. Opens the door and runs. That's very similar to Valentine. He stops, he gives his name, and then he runs. He didn't submit in that situation. The third way you could look at this, the alternative way that Judge McMulty looked at it, is when you're issuing a parking ticket, you seize everyone in the car, and that's lawful. That's based on reasonable suspicion, probable cause. He can't just get up and run. And this circuit has not addressed that yet, but I think it was five or six circuits all have said parking tickets is like a traffic stop. I think Judge Easterbrook said, unfortunately, that panel opinion that was withdrawn, which I did not realize, I think he makes a good point. You can't zoom away while someone's giving you a parking ticket. So, yes, you are seized at that point. So however you want to look at this, Judge McMulty was correct. Well, Easterbrook said that he can't zoom away. That doesn't answer the question as to when. Because arguably you can, and you're seized when police catch up with you. As soon as you walk up and start investigating a ticket situation where you see that there is a parking violation, the officers can seize everyone in that car. It can't be that unlike at a traffic stop where we pull you over, that you can just drive away. But we're talking about the driver. We're not talking about the driver. We're talking about the passenger. The way we're looking at this in this scenario is like a traffic stop. The officers can order, as someone pointed out, can order the passenger out of the car, can order the passengers to stay in the car, can order the passengers to put their hands up, all of those things. Those people are seized for officer safety. You can't have the passengers just doing things in the car while the officers are standing there. Issuing a ticket. And dangerous, yes. In fact, here there was a gun in the car. So, yes, it is a very dangerous situation. And quite frankly, I think the officers acted very appropriately here. There's no, again, no evidence of guns. The person who just said, I don't have a license to drive, they gave me the keys to let me drive away. So don't push the argument too far. Your Honor, they had just found a gun, a loaded gun in the car. I think there were more pressing issues. Let's move to the sentencing issue here because there has been a good point made by Ms. Oliveira that this panel ought to see the outcome here as one we cannot necessarily see as the outcome were we to determine that application of the four-level enhancement was error and the court would have been in a different situation would have imposed sentence than it was when it actually imposed sentence. How can we have that requisite certainty or near certainty that what occurred here occurred irrespective of whatever error, of the error that took place? Well, the standard is it's not a near certainty. It's a high probability. And here, I think when you look at it, what Judge McMulty actually said, this is not a situation where he granted enhancement and then gave some kind of unspecified variance or just gave a low sentence and didn't explain how the connection was made. Here he said, I'm going to give you enhancement, but it's a hollow victory. He then said, I'm going to vary to the range that would be if the four-level enhancement did not apply. So he physically went from the range to the range that otherwise would have applied and explained why he was doing it. But doesn't he also tether that to the credit he was giving this individual for the time he spent in state custody? Well, that's the second part of the variance, Your Honor. The first part of the variance is very clear. I'm going from whatever it is, 120 to 84 to 105, and the reason is this four-level enhancement. Yes, it technically applies, but I think it's a little crazy. And I don't think he could have been – I mean, he could have been maybe a little bit clearer, but I think he was pretty clear that, you know, the hollow victory, the four – you know, it's a four-point variance because of that enhancement. I mean, these are the words that he used. And I think it's highly probable that he – you know, this did not affect the sentence, given what Judge McMulty said. But on the enhancement itself, we think it's – Yeah, let's talk about the enhancement itself. It – well, I'm not going to ask if you think it was a stretch because I know what your answer is going to be, but – I'm not so sure. I think the thing, Mr. Brown, when I was made here, the credibility is Boston is back there one of the more credible lawyers in the world I've ever met. I'm not so sure what his answer would be if you posed the question to him. As a common-sense individual as opposed to an advocate who's paid to make a certain argument. How's that for a skewed question? I think we could all agree that it's not in the sort of heartland of how this usually applies. Very well done. This has happened in the Navarro case itself. They said this is not a typical use of the enhancement. And again, I would credit what – It's crazy. I would credit what Judge McMulty did here. The guidelines apply. I think that we ought to treat Judge McMulty's characterization as a finding of facts. I think what Judge McMulty did here was he said, look, when the guidelines technically apply, the enhancement technically applies. And we think that's right, and I can explain why in a second. I think it technically applies, but I think it's a little harsh, and so I'm bearing. So I think that that was a commendable thing to do. I think he might have done the right thing. The way that the guideline applies is, or the enhancement applies, possession in connection with another felony offense. Now, this court has a line of cases that's not, I think, crystal clear, but the commission has changed the guideline a little bit, changed the application a little bit. And so what is the test? Is it another felony offense? And the court says that means an offense other than the drug possession, the gun possession. And what is the offense? The offense here is evidence tampering. And I think the point that we need to make is, first of all, the elements are different. We could all agree on that. The Blockberger test is a different element. Second is it's a different offense. But let's focus on the word tampering. What is the actus reus of tampering here? Well, the statute says, alters, destroys, conceals, or removes. And I also point out that there is an intent element there. So let me give you two scenarios, both of which where he possesses the gun but doesn't tamper with it. First scenario, his cousin comes up to him and says, I got this great gun. It's my favorite. Do you want it? He takes it. He now possesses the gun. He's now committed the felony possession offense, but he hasn't tampered with that gun because he does not have the intent to alter, conceal, or remove the gun. Right. So how does he tamper with the gun? He hasn't tampered with it in that scenario. Here, he's tampered with it because he knows that there's an investigation. He knows that they want to get rid of this gun. This is what he says in the jail calls. He knows all about this. He's going to take the gun and he's going to hide it. And not just that, the night he is arrested, he is on the street attempting to sell it. That is what he tells his mother and his father and his girlfriend, whoever it is, in the jail calls. So this is far more than merely possessing it. And the other example I was going to give you is his cousin comes up to him and says, I used this gun to, you know, assault my girlfriend. Do you want to see it? And he takes it and he holds it. He has now committed felony possession again, but he still hasn't tampered with the gun because he doesn't have the intent. He hasn't removed it. He hasn't destroyed it. He hasn't concealed it. He hasn't altered it. So in this case, he has done at least one or two of those things. He's removed it. He's attempting to sell it, all with the intent to obstruct the investigation. So this is more than merely possessing the gun. He has done far more than that. This is similar to the Seventh Circuit has a case called Wise, where the gun itself is where the enhancement comes into play because he left it somewhere where a child could pick it up. And, again, other circuits have looked at tampering and said, yes, it technically applies. I think it's the Tenth Circuit and a couple of other circuits. So we think it does technically apply. And, again, we think that Judge McNulty, to the extent there was an error and we don't think there was one, rendered it harmless by saying, I'm going to vary by those four levels, get back to the range that would apply otherwise. Court, have any other questions? I would ask that you confirm. I have none. Thank you very much, Mr. Romano. And we'll hear from Ms. Oliveira in rebuttal. Thank you, Your Honor. To answer the court's question, the actus reus of the tampering offense is possessing the firearm. This court— What about the conversations where he's trying to unload the firearm, get rid of it? Those are the jail call recordings, and they do communicate that he possessed the firearm. With the intent to get rid of it. With the intent to get rid of it. The intent is key. The intent is key, but the law of this circuit looks at a distinction in time or conduct. And the only conduct that we have here is possession of the firearm, whether you call it taking the firearm, hiding the firearm, whatever you want to say it is. At the end of the day, all he did was possess the firearm. This court has always interpreted another felony offense to mean that there is a prohibition on double counting. And this is exactly what we have here. This isn't a burglary. This isn't an assault where there's a breaking and entering. There's a threat. There's something else that's done with the firearm. Here— Is it a crime under the New Jersey statute to attempt to tamper with evidence? It's not. As we presented to the court, we recognize that this was an unpreserved argument. But the government has not been able to present the court with one case that shows that the New Jersey evidence tampering statute applies to the facts of this case. The attempt. To the attempt. That's correct. The New Jersey Supreme Court's case in Mendez interprets the evidence tampering statute only to apply to attempts to tamper with evidence where there's some sort of permanent elements, some permanent concealment, permanent alteration, something like that. They say that this statute doesn't apply to unsuccessful attempts to hide or discard contraband, and they provide a policy justification for that, which is that contraband is almost always hidden or discarded. And when it's recovered, it's of undiminished value to law enforcement. So it makes no sense to be charging people for unsuccessful attempts to hide or tamper with evidence. One more point on the harmlessness issue. When Judge McNulty declares this a hollow victory for the government, he does not do this when he's pronouncing sentence. It's during the sentencing arguments. And right after he says that it's a hollow victory, he makes clear that he can still be convinced. But I did read that. I made a point in the initial argument, as far as I saw it, but I was again trying to peruse the transcript of the sentencing proceeding, which I read the entire proceeding. It is just crystal clear to me that what he was doing was yielding to the prosecution's profit and sanity, applying this sort of enhancement, but then fixing it right away. There's no way to read that transcript in his remarks and not come away thinking that what he did was think that, okay, it technically applies, but I'm going to take care of this. I don't dispute the fact that Judge McNulty tried to, what he says, undo much of the effect of this enhancement. Our position is that granting a variance based on disagreement with the enhancement is not the same as not taking it into account at all. This enhancement was front and center during the sentencing hearing. Judge McNulty heard argument on it. He discussed what parts of the argument he found persuasive, which parts he didn't. And he did give us many reasons for granting a variance, but what he didn't give us was reasons why he wasn't going to take this into account. Thank you very much. Thank you. Thank you very much, Mr. Romano. We appreciate the excellent arguments you have both provided us. The panel will take the case.